No. 24-5222

IN THE
# United States Court of Appeals
# for the Sixth Circuit

INSIGHT TERMINAL SOLUTIONS, LLC,
*Debtor*,

INSIGHT TERMINAL SOLUTIONS, LLC,
*Plaintiff-Appellant*,

v.

CECELIA FINANCIAL MANAGEMENT, LLC; OASIS AVIATION, LLC;
HALAS ENERGY, LLC; JOHN J. SIEGEL, JR.,
*Defendants*,

BAY BRIDGE EXPORTS, LLC,
*Intervenor-Defendant-Appellee*.

On Appeal from the Bankruptcy Appellate Panel
of the Sixth Circuit, No. 23-8004
Bankruptcy Court, Nos. 3:21-ap-03013, 3:19-bk-32231
Hon. Joan A. Lloyd

## APPELLANT'S OPENING BRIEF

ROBERT M. HIRSH
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 318-3060
robert.hirsh@nortonrosefulbright.com

JESSICA L. ELLSWORTH
NATHANIEL A.G. ZELINSKY
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

DAVID P. SIMONDS
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
(310) 785-4600
david.simonds@hoganlovells.com

July 29, 2024

**CORPORATE DISCLOSURE STATEMENT**

Appellant Insight Terminal Solutions, LLC is a wholly owned subsidiary of Autumn Wind Lending, LLC, which is wholly owned by Ridgedale Partners, LLC. No publicly held corporation owns 10% or more of Insight Terminal Solutions, LLC, Autumn Wind Lending, LLC, or Ridgedale Partners, LLC.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... v

STATEMENT REGARDING ORAL ARGUMENT ............................................. 1

JURISDICTIONAL STATEMENT ................................................................ 1

INTRODUCTION ...................................................................................... 1

STATEMENT OF THE ISSUES ................................................................... 6

STATEMENT OF THE CASE ...................................................................... 6

    A. Legal Background ......................................................................... 6

    B. John Siegel Secures An Option To Sublease The Oakland
    Terminal ......................................................................................... 7

    C. The Siegel Family Repeatedly Renews The Option To
    Sublease ......................................................................................... 8

    D. Siegel Forms Insight Terminal Solutions And Funds It Via
    His Shell Companies ........................................................................ 9

    E. In 2018, Insight Terminal Solutions Receives Loans From
    Bay Bridge And Autumn Wind ....................................................... 10

    F. In 2019, Insight Terminal Solutions Files For Bankruptcy,
    And John Siegel Dies Before His Deposition Is Concluded ............. 12

    G. Cecelia Transfers Its Claim To Bay Bridge .................................. 14

    H. The District Court Copies Bay Bridge's Proposed Opinion
    Verbatim ......................................................................................... 15

    I. The Bankruptcy Appellate Panel Affirms .................................... 17

SUMMARY OF THE ARGUMENT .............................................................. 18

STANDARD OF REVIEW .......................................................................... 22

ARGUMENT ................................................................22

I. THE BANKRUPTCY COURT ERRED IN EXCLUDING JOHN
SIEGEL'S CRITICAL TESTIMONY .....................................22

   A. Siegel's Deposition Was Admissible Under Rule
   801(d)(2).................................................................23

   B. Siegel's Deposition Was Admissible Under Rule 32.........................30

   C. The Bankruptcy Court's Errors Were Highly Prejudicial ..................34

II. THE BANKRUPTCY COURT'S RECHARACTERIZATION
ANALYSIS WAS RIDDLED WITH ERRORS .........................37

   A. Cecelia's Debt Is Eligible For Recharacterization ..............................37

     1. Non-Shareholder Debts Can Be Recharacterized ...........................38

     2. This Case Does Not Concern Veil Piercing....................................39

     3. Insider Status Was Not Required, And The Siegel
     Family Controlled Cecelia And Insight .........................................39

   B. The *AutoStyle* Factors Required Recharacterization ...........................42

     1. The Absence Of A Fixed Maturity Date And Interest
     Payments Is Indicative Of Equity.................................................42

     2. Cecelia's Notes Were Unsecured .................................................45

     3. The Siegel Family Subordinated Itself To Outside
     Creditors ....................................................................................48

     4. The Siegel Family Could Not Obtain Other Outside
     Funding.......................................................................................49

     5. The Siegel Family Expected To Be Repaid When Its
     Business Succeeded.....................................................................50

6. The Siegel Family Financing Paid For The Sublease, Which Was A Capital Asset ............................................................52

7. Insight Was Inadequately Capitalized.............................................53

8. There Was An Identity Of Interest Between Insight And Cecelia .....................................................................................54

9. There Was No Sinking Fund.............................................................55

10. The Label Is Not Dispositive .........................................................56

III. THE BANKRUPTCY COURT FAILED TO EXERCISE INDEPENDENT JUDGMENT IN ADOPTING BAY BRIDGE'S PROPOSED OPINION VERBATIM ....................................................................................57

CONCLUSION.......................................................................................59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS

# TABLE OF AUTHORITIES

Page

CASES:

*Anderson v. City of Bessemer*,
470 U.S. 564 (1985).........................................................57

*Andre v. Bendix Corp.*,
774 F.2d 786 (7th Cir. 1985) ...........................................57

*Azarax, Inc. v. Syverson*,
990 F.3d 648 (8th Cir. 2021) ..........................3, 18, 19, 25

*Bank of Montreal v. Est. of Antoine*,
86 So. 3d 1262 (Fla. App. 2012) .....................................32

*Browning v. Levy*,
283 F.3d 761 (6th Cir. 2002) ...........................................46

*Burt v. Ware*,
14 F.3d 256 (5th Cir. 1994) .......................................27, 28

*Calhoun v. Baylor*,
646 F.2d 1158 (6th Cir. 1981) ....................................29, 30

*Carn v. Heesung PMTech Corp.*,
579 B.R. 282 (M.D. Ala. 2017) .......................................38

*Covino v. Reopel*,
89 F.3d 105 (2d Cir. 1996) ..............................................28

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017)...........................................................6

*Derewecki v. Pennsylvania R. Co.*,
353 F.2d 436 (3d Cir. 1965) .............................................32

*Duttle v. Bandler & Kass*,
127 F.R.D. 46 (S.D.N.Y. 1989) ...................................31, 32

*Edwards v. U.S. Att'y Gen.*,
97 F.4th 725 (11th Cir. 2024) ............................................................30

*Estate of Shafer v. Comm'r*,
749 F.2d 1216 (6th Cir. 1984) ...........................................3, 18, 19, 24

*Equal Emp. Opportunity Comm'n v. Triangle Catering, LLC*,
No. 5:15-CV-00016-FL, 2017 WL 818261, (E.D.N.C. Mar. 1,
2017) .....................................................................................................25

*Foresun, Inc. v. Comm'r*,
348 F.2d 1006 (6th Cir. 1965) .............................................38, 40, 42

*Forrest v. Kissam*,
7 Hill 463 (N.Y. Sup. Ct. 1844) .........................................................32

*Freudensprung v. Offshore Tech. Servs., Inc.*,
379 F.3d 327 (5th Cir. 2004) ..............................................................27

*Huff v. White Motor Corp.*,
609 F.2d 286 (7th Cir. 1979) ..............................................................24

*In re AtlanticRancher, Inc.*,
279 B.R. 411 (Bankr. D. Mass. 2002) ................................................39

*In re Autobacs Strauss, Inc.*,
473 B.R. 525 (Bankr. D. Del. 2012)........................43, 48, 49, 52, 54

*In re AutoStyle Plastics, Inc.*,
269 F.3d 726 (6th Cir. 2001) ......................................................*passim*

*In re Bayonne Med. Ctr.*,
No. 07-15195 MS, 2011 WL 5900960 (Bankr. D.N.J. Nov. 1,
2011) .....................................................................................................30

*In re Cmty. Bank of N. Va.*,
418 F.3d 277 (3d Cir. 2005) ...............................................................57

*In re Comprehensive Power, Inc.*,
578 B.R. 14 (Bankr. D. Mass. 2017) ..................................................38

*In re Curry*,
  509 F.3d 735 (6th Cir. 2007) ...............................................................22

*In re Dornier Aviation (N. Am.), Inc.*,
  453 F.3d 225 (4th Cir. 2006) ...............................................38, 42, 48

*In re Est. of Margolin*,
  259 A.D.2d 396 (N.Y. App. Div. 1999) ..........................................47

*In re Hedged-Invs. Assocs., Inc.*,
  380 F.3d 1292 (10th Cir. 2004) .....................................................51, 52

*In re Hoffinger Indus., Inc.*,
  327 B.R. 389 (Bankr. E.D. Ark. 2005) ............................................39

*In re Live Primary, LLC*,
  626 B.R. 171 (Bankr. S.D.N.Y. 2021) .........................................44, 55

*In re SubMicron Sys. Corp.*,
  432 F.3d 448 (3d Cir. 2006) ...............................................................56

*In re Wingerter*,
  594 F.3d 931 (6th Cir. 2010) ..............................................................22

*Inland Bonding Co. v. Mainland Nat. Bank of Pleasantville*,
  3 F.R.D. 438 (D.N.J. 1944) .................................................................32

*Kilburn v. United States*,
  938 F.2d 666 (6th Cir. 1991) .........................................................22, 57

*Klocke v. Watson*,
  No. 22-10348, 2023 WL 2823060 (5th Cir. 2023) ..........................24

*Landgraf v. USI Film Prod.*,
  511 U.S. 244 (1994) ............................................................................28

*Lavoho, LLC v. Apple, Inc.*,
  232 F. Supp. 3d 513 (S.D.N.Y. 2016) ..............................................25

*Lighting & Power Services, Inc. v. Roberts*,
354 F.3d 817 (8th Cir. 2004) ...........................................................28

*Mactec, Inc. v. Bechtel Jacobs Co., LLC*,
346 F. App'x 59 (6th Cir. 2009) ......................................................57

*Moore v. Local 569 of Intern. Broth. of Elec. Workers*,
53 F.3d 1054, (9th Cir. 1995) ..........................................................28

*Nationwide Life Ins. Co. v. Richards*,
541 F.3d 903 (9th Cir. 2008) ...........................................................31

*N.W. v. City of Long Beach*,
2016 WL 9021966 (C.D. Cal. June 7, 2016) ...................................24

*Paluch v. Sec'y Pennsylvania Dep't Corr.*,
442 F. App'x 690 (3d Cir. 2011) ......................................................28

*Paulson v. Jefferies & Co.*,
No. CV 98-2644 FMC(AIJX), 2002 WL 34453504 (C.D. Cal. Mar.
20, 2002) ..........................................................................................32

*Phillips v. Grady Cnty. Bd. of Cnty. Comm'rs*,
92 F. App'x 692 (10th Cir. 2004) ....................................................24

*Re-Trac Corp. v. J. W. Speaker Corp.*,
212 F. Supp. 164 (E.D. Wis. 1962) ..................................... 20, 32-34

*Rock Creek Hydropower, Inc. v. Enel N. Am., Inc.*,
No. CV-04-0556-S-BLW, 2006 WL 292107 (D. Idaho Feb. 7,
2006) ................................................................................................25

*Rogers v. First Oakbrook Corp. Syndicate*,
No. C 95-2593 FMS, 1996 WL 329635 (N.D. Cal. June 6, 1996).....25

*Roth Steel Tube Co. v. Comm'r*,
800 F.2d 625 (6th Cir. 1986) ...........................................................49

*Sherif v. AstraZeneca*,
No. CIV.A. 00-3285, 2002 WL 32350023, (E.D. Pa. May 9, 2002) .................25

*Squire v. Stringer*,
  820 F. App'x 429 (6th Cir. 2020) ................................................. 22, 34

*Stinnett's Pontiac Serv., Inc. v. Comm'r*,
  730 F.2d 634 (11th Cir. 1984) ................................................... 43, 48

*Tatman v. Collins*,
  938 F.2d 509 (4th Cir. 1991) ........................................................ 33

*Texas Farm Bureau v. United States*,
  725 F.2d 307 (5th Cir. 1984) ............................................... 43, 48, 56

*Tracinda Corp. v. DaimlerChrysler AG*,
  362 F. Supp.2d 487 (D. Del. 2005) ................................................ 25

*Treharne v. Callahan*,
  426 F.2d 58 (3d Cir. 1970) ......................................................... 32

*United States. v. Anderson*,
  783 F.3d 727 (8th Cir. 2015) ....................................................... 28

*United States v. Est. of Mathewson*,
  No. CV SA-11-CA-00018-FB, 2016 WL 7409855, (W.D. Tex.
  Apr. 19, 2016) ....................................................................... 24

*United States v. Lozano*,
  63 F. App'x 962 (8th Cir. 2003) .................................................... 28

*United States v. Ratliff*,
  58 F. App'x 77 (6th Cir. 2003) ..................................................... 28

*United States v. Sperrazza*,
  804 F.3d 1113 (11th Cir. 2015) .................................................... 28

*U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at
  Lakeridge, LLC*,
  583 U.S. 387 (2018) ................................................................. 41

*United States Equal Emp. Opportunity Comm'n v. Placer ARC*,
No. 2:13-CV-0577-KJM-EFB, 2016 WL 74032 (E.D. Cal. Jan. 7,
2016) ..........................................................................................19, 25

*Waterman S. S. Corp. v. Gay Cottons*,
414 F.2d 724 (9th Cir. 1969) ................................................ 20, 32-34

*Wells Fargo Bank, N.A. v. Lincoln Ben. Life Co.*,
643 F. App'x 944 (11th Cir. 2016) ..................................................25

*Wright v. Morris*,
111 F.3d 414 (6th Cir. 1997) ..........................................................28

**STATUTES:**

11 U.S.C. §§ 101
(2)(B)..................................................................................................41
(31).....................................................................................................41
(31)(A)(i)............................................................................................42
(31)(B)(vi)..........................................................................................42
(31)(C)(ii)...........................................................................................42
(31)(E)................................................................................................41

11 U.S.C. § 502(b) .................................................................................36

28 U.S.C. § 158
(a) ........................................................................................................1
(b) ........................................................................................................1
(d)(1) ...................................................................................................1

28 U.S.C. § 1334 ......................................................................................1

**RULES:**

Fed. R. Bank. P. 7032 ......................................................................15, 31

Fed. R. Civ. P. 25(a)(1)...........................................................................24

Fed. R. Civ. P. 32(a)(1)...........................................................................31

Fed. R. Civ. P. 32(a)(4)(A) ........................................................31

Fed. R. Evid. 801(d)(2) ..............................................................23

OTHER AUTHORITIES:

About Us, Oakland Bulk and Oversized Terminal,
   http://obotjv.com/about-us/ ..................................................7

Agenda Book for the Committee on Rules of Practice and Procedure,
   (June 6, 2023), https://tinyurl.com/bdzmw9ej .................27

Black's Law Dictionary (11th ed. 2019)
   *Asset* ...................................................................................52
   *Fund* ....................................................................................55

1 McCormick On Evidence (8th ed., July 2022 Update) ........................................32

7 Moore's Federal Practice-Civil (2024) ...........................................4, 32

Notes of Advisory Committee on Proposed Rules, Fed. R. Evid. 801 ....................34

Order Amending Federal Rules of Evidence, (U.S., April 2, 2024),
   https://tinyurl.com/mjra3w89 .....................................26, 30

Report of the Advisory Committee on Evidence Rules (May 10,
   2023), https://tinyurl.com/5duuhbam ..........................27

4 John Henry Wigmore, Evidence in Trials at Common Law (1972) ....................24

6 Charles Alan Wright, Arthur R, Miller & Richard L. Marcus,
   Federal Practice and Procedure (3d ed. June 2024 update) ....................4, 19, 31

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Insight Terminal Solutions, LLC respectfully requests oral argument. This appeal presents a bankruptcy dispute involving millions of dollars in disputed debt, and it raises legal issues regarding the rules of evidence, civil procedure, and substantive bankruptcy law. Argument would be helpful to answer any questions this Court may have.

## JURISDICTIONAL STATEMENT

The Bankruptcy Court had jurisdiction under 28 U.S.C. § 1334 and entered judgment on January 11, 2023. Opinion, R. 125, Page 49.[1] Appellant appealed on January 20, 2023. Notice of Appeal, R. 126, Page 3. The Bankruptcy Appellate Panel had jurisdiction under 28 U.S.C. § 158(a)-(b) and entered judgment on February 28, 2024. Judgment, BAP R. 25-1, Page 1. Appellant appealed on March 8, 2024. Notice of Appeal, BAP R. 26, Page 3. This Court has jurisdiction under 28 U.S.C. § 158(d)(1).

## INTRODUCTION

This appeal arises from a bankruptcy. After a hearing, the Bankruptcy Court invited the parties to submit proposed decisions, and then adopted the winning side's draft verbatim. That one-sided opinion made blatant legal and factual errors. This

---

[1] R. refers to the adversary docket, No. 3:21-ap-03013. Bk. R. refers to the bankruptcy docket, No. 3:19-bk-32231. BAP R. refers to the Bankruptcy Appellate Panel docket.

Court should reverse, or at minimum vacate and remand for the Bankruptcy Court to redo its analysis.

The central actor in this saga is the late John Siegel, a Kentucky coal magnate. When Siegel could not obtain outside funding, he transferred family funds to his struggling business, Insight Terminal Solutions, LLC, via family-owned shell companies, primarily Cecelia Financial Management, LLC. Insight later went bankrupt. Siegel then filed a claim on behalf of Cecelia against Insight, alleging that the advance of funds was a loan and that his shell company Cecelia should be treated as a creditor.

The central question in this case is whether that transfer of funds qualified as *bona fide* debt or was really an equity contribution by the Siegel family to Insight Terminal Solutions. Under *In re AutoStyle Plastics, Inc.*, 269 F.3d 726 (6th Cir. 2001), a bankruptcy court's task is to examine the substance of a transaction to determine whether it "reflect[s] the characteristics of an arm's length negotiation." *Id.* at 750 (ellipses omitted). If the transaction does not appear similar to the product of an arm's length negotiation, the court treats the putative debt as equity and deprioritizes the claim in bankruptcy.

John Siegel had advanced cancer during this litigation. He sat twice for a deposition and testified at length. The parties adjourned to accommodate his health, and Siegel died before the deposition was closed. The testimony that Siegel gave

was damning: He confirmed that the so-called "loan" looked nothing like the product of an arm's length transaction. Siegel had chosen key terms at random (including putative maturity dates and interest rates), and he engaged in sloppy practices (such as using his shell companies' names interchangeably). But the Bankruptcy Court's opinion, drafted by the winning side, excluded Siegel's highly probative testimony, and refused to treat the Siegel family's investment as the equity contribution it was. This was reversible error in four ways.

*First*, Siegel's critical deposition was admissible under Federal Rule of Evidence 801(d)(2) as the statement of a party opponent. After Siegel's death, Cecelia had transferred its claim to Appellee Bay Bridge Exports LLC, which was run by Siegel's good friend. In the opinion Bay Bridge drafted, the court held that Rule 801(d)(2) no longer applied after the transfer because Bay Bridge rather than Cecelia became the nominal party opponent (although Cecelia was never dismissed from the case). That was wrong. This Court and others have applied Rule 801(d)(2) when a successor entity steps into the shoes of a predecessor and prosecutes its claim. *See Estate of Shafer v. Comm'r*, 749 F.2d 1216, 1219 (6th Cir. 1984); *Azarax, Inc. v. Syverson*, 990 F.3d 648, 652 (8th Cir. 2021). Bay Bridge, in seeking to vindicate *Cecelia's claim*, should not be able to escape evidence admissible *against Cecelia*. Indeed, a recent amendment to Rule 801(d)(2)—which applies retroactively as of

December 1, 2024, including in this appeal—confirms Rule 801(d)(2) applies in this precise context.

*Second*, Siegel's deposition was *also* admissible under Federal Rule of Civil Procedure 32. That rule applies in bankruptcy adversary proceedings and provides an independent hearsay exception. The Bankruptcy Court's opinion—again, a verbatim version of Bay Bridge's draft opinion—held that Rule 32 was *per se* inapplicable whenever a witness dies midway through a deposition.

The opposite is true. If "the witness died during the taking of the deposition, so that a party did not have adequate opportunity to cross-examine, the court has discretion whether to admit the deposition." 6 Charles Alan Wright, Arthur R, Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2146 (3d ed. June 2024 update). A court balances the prejudice of exclusion with the prejudice attributable to the lack of cross examination. *See* 7 *Moore's Federal Practice-Civil* § 32.22 (2024). Here, the prejudice from exclusion was extreme. Siegel confirmed the claim was really an equity contribution to his family business. Meanwhile, Bay Bridge would suffer no prejudice. When the parties planned the deposition, Bay Bridge never indicated its intent to examine Siegel. After Siegel's death, Bay Bridge offered conclusory assertions that it would have questioned Siegel but failed to identify even one concrete question it needed to ask. This evidentiary error was

outcome determinative and requires reversal, or at minimum remand for the Bankruptcy Court to evaluate admissibility under the proper legal framework.

*Third*, even without Siegel's deposition, the facts strongly favored treating the family's advance of funds as equity. The opinion made blatant errors. Consider the most obvious. In a critical section of its analysis, the opinion places great weight on the fact that an outside lender's loan was unsecured (as was Cecelia's). *That was wrong*. The outside lender's loan *was secured*. That glaring mistake was not alone. The opinion Bay Bridge handcrafted for itself was infected with legal and factual errors.

*Fourth*, this Court strongly discourages trial courts from doing what the Bankruptcy Court did: copying verbatim a decision proposed by a party. In determining whether a court has committed reversible error, this Court asks whether the trial court made modifications demonstrating independent judgment. The Bankruptcy Court did not. The wholesale adoption of Bay Bridge's opinion, errors and all, provides an independent ground for reversal.

## STATEMENT OF THE ISSUES

1.     Whether the Bankruptcy Court erred in excluding the deposition of John Siegel, the central actor who died before trial.

2.     Whether the Bankruptcy Court erred in not recharacterizing the Siegel family's claim as equity.

3.     Whether the Bankruptcy Court abused its discretion in adopting Appellee's proposed opinion verbatim.

## STATEMENT OF THE CASE

### A.  Legal Background.

An important "underpinning of business bankruptcy law" is the Bankruptcy "Code's priority system."  *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017).  Higher "priority creditors" are typically paid first, followed by "lower priority creditors."  *Id.*  Owners, *i.e.* equity holders, ordinarily have lowest priority and often do not receive any payment in bankruptcy.

In this case, a family business faced difficulty obtaining financing, and the family injected their own capital into their business.  The key question is whether the family's "advance of money" is better classified as "equity" or "debt."  *AutoStyle Plastics*, 269 F.3d at 749.  That classification determines whether the family's claim will be paid under the reorganization plan approved by the Bankruptcy Court.

The process of determining whether a claim is debt or equity is known as "recharacterization." "The more a transaction appears to reflect the characteristics of an arm's length negotiation, the more likely such a transaction is to be treated as debt." *Id.* at 750 (brackets and ellipses omitted, capitalization added). In *AutoStyle*, this Court identified factors that inform this substance-over-form analysis, including "the security, if any," for the putative debt, whether the putative debt was "subordinated to the claims of outside creditors," and "the corporation's ability to obtain financing from outside lending institutions" on similar terms. *Id.*

**B. John Siegel Secures An Option To Sublease The Oakland Terminal.**

The late John Siegel was a coal magnate in Louisville. Siegel acquired rights to develop and operate a port terminal in Oakland, California for shipping coal and other commodities. *See About Us*, Oakland Bulk and Oversized Terminal, http://obotjv.com/about-us/.

Siegel structured his finances using a complicated series of family owned and operated limited liability companies. In 2014, one of Siegel's companies—Terminal Logistics Solutions, LLC—paid $500,000 for "the exclusive right to negotiate a sublease and operating agreement for" the Oakland terminal. Undisputed Facts, R. 106, Page 2. Shortly afterward, Terminal Logistics Solutions paid $700,000 for an option to sublease the terminal. *Id.* at 3.

Terminal Logistics Solutions "was a wholly owned subsidiary of Bowie Resource Partners, LLC," which was majority owned by Cedars Energy, LLC. *Id.* at 2. Cedars Energy is owned by the Siegel family. Siegel Deposition, R. 70, Page 24.

**C. The Siegel Family Repeatedly Renews The Option To Sublease.**

The Oakland development faced hostility because of its links to coal, and the project stagnated. The Siegels' option to sublease was set to expire in July 2015. The family viewed the Oakland development as a "nest egg," and John Siegel was eager to preserve it. Siegel Deposition, R. 70, Page 65. Over the next few years, he "repeatedly" paid to extend the option to sublease. Undisputed Facts, R. 106, Page 3.

Everyone agrees the Siegels funded Terminal Logistics Solutions "with equity contributions" through September 2016. *Id.* This appeal involves what happened after September 2016. Appellant's position is that the family continued to provide equity contributions; Appellee's position is that the family switched to providing *bona fide* debt.

In October 2016, Bowie provided additional funding to Terminal Logistics Solutions. For the first time, the funds were subject to a promissory note. That note listed Terminal Logistics Solutions as borrower, Bowie as lender, and Cedars as guarantor. *Id.*

Over the next few years, John Siegel provided capital through three shell companies: Halas Energy, LLC; Oasis Aviation, LLC; and Cecelia Financial Management, LLC. Siegel was the non-member manager for each LLC. His wife and adult children owned them. *Id.* at 2; Siegel Deposition, R. 70, Page 16. Siegel's business paid outside creditors. The business, however, never made any principal or interest payments on these putative debts to the shell companies. Nor did the Siegels amend the notes to reflect any accrued and unpaid interest. *See* Tandon Deposition, R. 68-28, Page 30; Written Discovery, R. 68-29, Page 6.

Below, the Siegels declined to defend Halas and Oasis. Only Cecelia's purported debts are at issue here. Summary Judgment Order, R. 62, Page 3.

### D. Siegel Forms Insight Terminal Solutions And Funds It Via His Shell Companies.

In October 2017, Siegel organized a new company called Insight Terminal Solutions, LLC—or "Insight" for short. Undisputed Facts, R. 106, Page 2. Insight is the debtor that filed for bankruptcy.

Insight Terminal Solutions was owned by Insight Terminal Holdings, which was owned by John Siegel's wife. As with the other LLCs, Siegel was the non-member manager. *Id.* Insight never "generated" "operating revenues." *Id.* at 5. The "only assets of substantial value were the" Oakland sublease and the ability to renew it. *Id.*

9

In 2017 and in 2019, Insight provided Cecelia promissory notes purporting to represent capital infusions of nearly $5.7 million. Under the terms of these notes, Insight purported to agree to pay Cecelia debts owed to Bowie by Terminal Logistics Solutions. *Id*. at 4.

The Siegel family regularly moved funds between shell companies and engaged in "sloppy" practices. Siegel Deposition, R.70, Page 17-18. The names of the shell companies were used interchangeably, even when "dealing with external parties." *Id* at 18. The notes' terms came from a "generic template" and John Siegel "didn't think about" them. *Id*. at 26. The Siegel "family company" was "owed the money," and in Siegel's view, it "didn't matter" what the notes said. *Id*. Insight and Cecelia "were all indirectly related companies" with—in Siegel's words—a "nepotistic relationship." *Id*. at 64.

### E. In 2018, Insight Terminal Solutions Receives Loans From Bay Bridge And Autumn Wind.

Siegel needed to use family funds because Oakland's liberal politics "spooked" lenders who feared the city would sabotage a coal related development. *Id*. at 67. The Siegel family approached eighteen lenders. All declined to lend. Written Discovery, R. 68-29, Pages 10, 16-17.

In the end, the Siegels received funding from two sources. In May 2018, Bay Bridge Exports LLC—a company operated by John Siegel's "good friend"—lent $5 million to Insight in exchange for a promissory note, with rights to convert the note

into equity. Siegel Deposition, R. 70, Page 25; Undisputed Facts, R. 106, Pages 4. In September 2018, an investment fund—Autumn Wind Lending, LLC—provided Insight a secured, short-term bridge loan of $6.8 million. Undisputed Facts, R. 106, Pages 4-5.

The Autumn Wind loan came with strict conditions. *First*, Autumn Wind required that Bay Bridge amend its note to substitute John Siegel as the borrower. *Id*. Autumn Wind also required Insight to confirm (falsely, it turned out) that Insight had no other debts and would not assume additional debt. *See* Bridge Loan, R. 74, Pages 42, 50. This should have meant Autumn Wind would not vie with other creditors for repayment. *Second*, Autumn Wind acquired a security interest in the sublease, which could be sold to repay Autumn Wind. *Id*. at 28, 38, 56. Autumn Wind also acquired a separate security interest in Insight Terminal Holdings' equity stake in Insight. *Id*. at 26, 28, 30; Pledge, Bk. R. 12, Pages 64-65.

John Siegel failed to disclose Insight's purported debts to the shell companies. Autumn Wind sued Siegel and his shell companies for fraud and tortious interference in a different lawsuit. After the companies' counsel withdrew, the District Court recently instructed Autumn Wind to file a motion for default judgment. *See* Order, *Autumn Wind Lending, LLC v. Cecelia Financial Management, LLC*, No. 3:22-cv-002255-RGJ (W.D. Ky. June 26, 2024).

This figure summarizes the relationship between Insight, the shell companies, Bay Bridge, and Autumn Wind.



### F. In 2019, Insight Terminal Solutions Files For Bankruptcy, And John Siegel Dies Before His Deposition Is Concluded.

In the fall of 2019, Siegel could not repay the Autumn Wind loan at maturity. Insight filed for bankruptcy. Petition, Bk R. 1, Page 1. This triggered an automatic bankruptcy stay, which prevented Autumn Wind from enforcing its security interest. The bankruptcy produced a confirmed plan under which Autumn Wind paid to acquire the sublease and Insight. Confirmation Order, Bk. R. 379, Page 12; Plan, Bk. R. 195, Pages 9, 18.

During the bankruptcy, John Siegel's shell companies filed claims to collect purported debts. In 2021, Insight—now owned by Autumn Wind—brought this

adversary proceeding to contest those claims. Complaint, R. 1. Insight is the Appellant. After the Siegels declined to defend the two other shell companies, only Cecelia's claim remained. Summary Judgment Order, R. 62, Page 3. Insight argued that Cecelia's putative debt should be recharacterized as equity under *AutoStyle*. Insight also argued that the Bankruptcy Court should disallow Cecelia's claim because Cecelia failed to provide sufficient evidence to substantiate its amount and validity.

As the matter progressed, John Siegel developed advanced cancer. Because Siegel was both Cecelia's designated corporate representative and the point person in the web of transactions, Insight repeatedly sought to depose him. Siegel was deposed twice. Each time, the parties adjourned after several hours of deposition testimony to accommodate Siegel's health. *See* Declaration and Suggestion of Death, R. 78-1, Page 2-3.

On April 3, 2022, Siegel passed away with his deposition still open. *See* Declaration and Suggestion of Death, R. 78-1, Page 375. In the testimony Insight took, Siegel candidly confirmed the nepotistic relationship between his interconnected shell companies, and the illusory nature of the Cecelia notes. *See infra* pp. 35-36.

**G. Cecelia Transfers Its Claim To Bay Bridge.**

The Appellee is Bay Bridge—the company operated by John Siegel's close friend. In 2021, over Insight's objection, Bay Bridge intervened and asserted a security interest in Cecelia's claim, which security interest Bay Bridge had purportedly acquired after Insight had filed for bankruptcy. Intervention Order, R. 21; Line of Credit Note, R. 9-1, Page 2.

On July 20, 2022—over a year after Insight challenged Cecelia's claim, just three months after Siegel's death, and shortly before an evidentiary hearing— Cecelia notified the Bankruptcy Court that it had transferred its claim to Bay Bridge. *See* Notice of Transfer, Bk. R. 442, Pages 1-2. Cecelia then largely ceased to participate, although it remained a party to the proceedings and a named defendant.

Bay Bridge moved to exclude Siegel's deposition. Bay Bridge acknowledged Siegel was "the person most capable of speaking to" key issues. Declaration and Suggestion of Death, R. 78-1, Pages 3-4. But Bay Bridge argued that the Bankruptcy Court should ignore this critical evidence because Siegel had died while his deposition remained open, and Bay Bridge had not cross examined him. *Id.*

Prior to the deposition, however, Bay Bridge had never indicated any intent to question Siegel. Bay Bridge appeared at the deposition, but neither reserved time for cross examination, nor identified any documents about which it intended to inquire. Trial Tr., R. 117, Pages 10-11, 24, 26. Before the Bankruptcy Court, Bay

Bridge did not articulate any concrete questions it would have asked Siegel. The Bankruptcy Court withheld judgment on the motion until after trial. Trial Tr., R. 117, Page 28.

### H. The District Court Copies Bay Bridge's Proposed Opinion Verbatim.

After a hearing, the Bankruptcy Court requested the parties submit proposed decisions. The court then issued a nearly fifty-page opinion that copied Bay Bridge's proposed opinion *verbatim*. Three aspects are relevant for this appeal.

*Siegel's Testimony.* The opinion excluded Siegel's testimony as hearsay. Insight argued that Siegel's deposition was not hearsay because, under Federal Rule of Evidence Rule 801(d)(2), statements of a party opponent or its agent are not hearsay. The opinion held, however, that Rule 801(d)(2) did not apply because Bay Bridge was the nominal party opponent (rather than Cecelia)—even though Bay Bridge stands in Cecelia's shoes and seeks to prosecute Cecelia's claim. Opinion, R. 125, Page 12.

Insight also argued that Siegel's deposition was independently admissible under Federal Rule of Civil Procedure 32, which provides a hearsay exception for depositions and applies in adversary proceedings. *See* Fed. R. Bank. P. 7032. The opinion held that Siegel's testimony was *per se* inadmissible. According to the opinion, "Courts have uniformly held that Rule 32(a)(1) requires that the party opposing admission of the statement have had a reasonable opportunity to cross-

examine the deponent." Opinion, R. 125, Page 7. Finally, Bay Bridge inserted an additional caveat: Even if were admissible, Siegel's testimony "would be entitled to little, if any, weight" because of the lack of cross examination by Bay Bridge. *Id*. at 13.

*Recharacterization*. The opinion refused to recharacterize Cecelia's purported debts as equity. At the outset, the opinion held that Cecelia's claim could not be recharacterized because only "an equity holder" of the debtor is subject to recharacterization, and Cecelia itself had not owned equity in Insight. *Id*. at 27. In the alternative, the opinion concluded that not a single *AutoStyle* factor favored recharacterization. The opinion made glaring errors, including repeatedly asserting that Autumn Wind's loan was effectively *unsecured*. *Id*. at 20, 45. The opposite was true.

*Disallowance*. The opinion refused to disallow Cecelia's claims for lack of proof. Schedules attached to each note purported to list the amounts owed to Cecelia. Siegel's deposition confirmed, however, that some amounts had been repaid, and testimony at trial showed that other amounts were never advanced by Cecelia. According to the opinion, Insight bore "the burden" to disprove the schedules' accuracy and had failed to do so. *Id*. at 25.

## I.  The Bankruptcy Appellate Panel Affirms.

Insight appealed.  The Bankruptcy Appellate Panel identified several critical errors but declined to correct them.

*Siegel's Testimony*.  The Panel emphasized that the exclusion of Siegel's testimony was outcome determinative.  Had the Bankruptcy Court considered that testimony, "the adversary proceeding to disallow or recharacterize the claim at issue may have turned out differently."  BAP Opinion, BAP R. 24-2, Page 2.

The Panel nevertheless affirmed.  The Panel agreed that Siegel's deposition was inadmissible under Rule of Evidence 801(d)(2).  *Id*. at 8.  As for Federal Rule of Civil Procedure 32, the Panel acknowledged that the Bankruptcy Court erred: Rule 32 permits the introduction of depositions even where there is no cross examination.  *Id*. at 8-9.  The Panel nevertheless observed that "the Bankruptcy Court had discretion to exclude Mr. Siegel's deposition under Rule 32," and declared itself "hard-pressed to second-guess that exercise of discretion, especially when premised on the absence of cross-examination."  *Id*. at 9.

*Recharacterization*.  The Panel affirmed the refusal to treat Cecelia's contributions as equity.  The Panel recognized the Bankruptcy Court "overstate[d]" when it held that recharacterization applies *only* to debts asserted by those who were also existing equity owners.  *Id*. at 16.  "Recharacterization is not formulaic, and the applicability of the doctrine is not dictated solely by the formalities of the

transaction." *Id.* at 13. Under *AutoStyle*, "the more a transaction resembles the product of an arm's length negotiation, the more likely it qualifies as a loan." *Id.*

But the Panel expressed "reluctance" to recharacterize "a claim derived from an entity (Cecelia) who itself holds neither interest or control over the debtor." *Id.* at 14. According to the Panel, "without the benefit of Mr. Siegel's testimony," "the record in the present case only hints at" "control." *Id.* The Panel also stated that the Bankruptcy Court had "thoughtfully considered" the *AutoStyle* factors and found "no basis for disturbing" that analysis. *Id.* at 16.

*Disallowance*. The Panel affirmed "the Bankruptcy Court's judgment" on Insight's request to disallow Cecelia's claim "largely for the reasons set forth in the court's Opinion." *Id.* at 11.

This appeal follows.

## SUMMARY OF THE ARGUMENT

**I.** The Bankruptcy Court fatally erred in excluding John Siegel's deposition. This critical testimony was independently admissible under both Federal Rule of Evidence 801(d)(2) and Federal Rule of Civil Procedure 32.

**I.A.** This Court and others have held that Rule 801(d)(2) applies in the context of successors in interest who prosecute a claim derived from a predecessor. *See, e.g.*, *Estate of Shafer v. Comm'r*, 749 F.2d 1216, 1219 (6th Cir. 1984); *Azarax, Inc. v. Syverson*, 990 F.3d 648, 652 (8th Cir. 2021). The issue arises most frequently for

statements made by decedents admitted against their estates, *see, e.g.*, *Shafer*, 749 F.2d at 1219, but it can arise with respect to successor corporations, *see, e.g.*, *Azarax*, 990 F.3d at 652, and when the government sues on behalf of third parties, *see, e.g.*, *United States Equal Emp. Opportunity Comm'n v. Placer ARC*, No. 2:13-CV-0577-KJM-EFB, 2016 WL 74032, at *2 (E.D. Cal. Jan. 7, 2016). To hold otherwise produces arbitrary results, and at worst encourages transferring claims to manipulate the Rules of Evidence.

In April 2024, the Supreme Court promulgated an amendment to Rule 801(d)(2), removing all doubt the rule applies in this context. The amendment applies retroactively as of December 1, 2024. This Court should apply the amendment to this appeal.

**I.B.** Siegel's critical testimony was independently admissible under Federal Rule of Civil Procedure 32. Under Rule 32, if "the witness died during the taking of the deposition, so that a party did not have adequate opportunity to cross-examine, the court has discretion whether to admit the deposition." *Federal Practice and Procedure*, *supra* § 2146. A court balances the prejudices on either side. There is a venerable tradition of courts admitting depositions when a party could not cross examine a witness because the witness died.

In this case, the balance of factors cut decisively in favor of admission. Siegel's testimony was critical, and Bay Bridge suffered no prejudice. To be sure,

Bay Bridge attempted to manufacture an appearance of prejudice by asserting that it would have cross examined Siegel. But Bay Bridge's conclusory assertions failed to articulate how "cross-examination would have helped it materially" and "with particularity." *Waterman S. S. Corp. v. Gay Cottons*, 414 F.2d 724, 728 (9th Cir. 1969); *Re-Trac Corp. v. J. W. Speaker Corp.*, 212 F. Supp. 164, 169 (E.D. Wis. 1962).

**I.C.** The Bankruptcy Appellate Panel acknowledged that with Siegel's testimony, "the adversary proceeding to disallow or recharacterize the claim at issue may have turned out differently." BAP Opinion, BAP R. 24-2, Page 2. Siegel provided graphic details going to the heart of the *AutoStyle* factors, confirmed he did not care about the terms of the putative notes, and explained the nepotistic relationship between his shell companies. This Court should reverse, or at minimum vacate and remand.

**II.** Even without Siegel's testimony, the Bankruptcy Court erred in declining to treat Cecelia's claim as equity.

**II.A.** At the outset, in drafting the opinion the Bankruptcy Court signed as its own, Bay Bridge made three legal errors.

*First*, the opinion incorrectly concluded that Cecelia's debt was ineligible for recharacterization because Cecelia *itself* was not a preexisting shareholder. This Court and others have recharacterized non-shareholder debt as equity.

*Second*, the opinion theorized that it would need to pierce the corporate veil to consider Cecelia an insider subject to recharacterization. Not so. Courts conduct the *AutoStyle* analysis *without* piercing corporate veils.

*Third*, the opinion incorrectly concluded that insider status was necessary for recharacterization and that Cecelia was not an insider. Bay Bridge never raised this argument until submitting its draft opinion, affirmatively submitted evidence confirming Cecelia was an insider, and even agreed below that Cecelia was an insider. This bait and switch is intolerable. Regardless, Cecelia was subject to recharacterization irrespective of its status as an insider, and was also an insider. It was controlled and owned by the Siegel family, who controlled and owned Insight.

**II.B.** The opinion that Bay Bridge drafted repeatedly erred in analyzing the *AutoStyle* factors.

The opinion held that Cecelia's notes were *bona fide* because they were demand notes with interest. But the notes did *not* require that any interest actually be paid, and none ever was.

The opinion dismissed the fact that Cecelia's putative loans were unsecured—a critical factor under *AutoStyle*—on the ground that Autumn Wind's loan was similarly unsecured. But Autumn Wind's loan *was* secured.

The opinion concluded that Cecelia's debt was not subordinated to outside creditors because the terms of the notes did not say so. But courts look to *actual*

*practice* to determine subordination, and the Siegel family paid everyone else except Cecelia.

These errors, and more besides, require reversal or at minimum vacatur.

**III.**  This Court and the Supreme Court strongly discourage wholesale adoption of proposed opinions.  The Bankruptcy Court made not a single change to the 48 pages that Bay Bridge submitted.  This abuse of discretion is an independent reason for vacatur.

## STANDARD OF REVIEW

This Court reviews the Bankruptcy Court directly and affords the Bankruptcy Appellate Panel no deference.  *In re Curry*, 509 F.3d 735, 735 (6th Cir. 2007).  The Court reviews conclusions of law *de novo*, findings of fact for clear error, and evidentiary rulings for abuse of discretion.  *In re Wingerter*, 594 F.3d 931, 935 (6th Cir. 2010); *Squire v. Stringer*, 820 F. App'x 429, 434 (6th Cir. 2020).  This Court "frown[s] on the wholesale adoption" of proposed opinions, and reviews that practice for abuse of discretion.  *Kilburn* v. *United States*, 938 F.2d 666, 671 (6th Cir. 1991).

## ARGUMENT

### I.  THE BANKRUPTCY COURT ERRED IN EXCLUDING JOHN SIEGEL'S CRITICAL TESTIMONY.

Excluding John Siegel's critical testimony was legal error.  As the Bankruptcy Appellate Panel noted, had Siegel's deposition been admitted, "the adversary

proceeding to disallow or recharacterize the claim at issue may have turned out differently." BAP Opinion, BAP R. 24-2, Page 2. This Court should reverse, or at least remand for the Bankruptcy Court to consider Siegel's testimony in the first instance.

## A. Siegel's Deposition Was Admissible Under Rule 801(d)(2).

**1**. Siegel's deposition was admissible under Federal Rule of Evidence 801(d)(2). Rule 801(d)(2) exempts from hearsay out-of-court statements "offered against an opposing party" when, among other circumstances, the statements were made by "the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2).

Siegel was Cecelia's designated corporate representative and non-member manager. Rule 801(d)(2) permitted introducing Siegel's statements against Cecelia as a party opponent. Once Cecelia transferred its claim, Bay Bridge stood in Cecelia's shoes and assumed Cecelia's rights and responsibilities. Evidence admissible against Cecelia as a party opponent should have been equally admissible against Bay Bridge.

This Court and other Circuits have applied Rule 801(d)(2) to entities like Bay Bridge that assert claims derived from a prior party. This issue typically arises in the context of a decedent's statement offered against an estate. Much like Bay Bridge's relationship to Cecelia, an estate is a different party than and derives its

claims from a decedent. *Cf.* Fed. R. Civ. P. 25(a)(1). In *Estate of Shafer v. Comm'r*, 749 F.2d 1216 (6th Cir. 1984), the Court held that a decedent's statements were properly admitted against his estate, quoting Wigmore for the proposition that "[n]o modern court doubts that a *decedent*, whose rights are transmitted intact to his successor, is a person whose admissions are receivable against a party claiming the decedent's rights as *heir*, *executor*, or *administrator*." *Id.* at 1220 (quoting 4 John Henry Wigmore, *Evidence in Trials at Common Law* § 1081 (1972)).

The same is true of Bay Bridge's relationship to Cecelia. Bay Bridge is Cecelia's "successor," and received Cecelia's "rights" "intact." *Id.* A statement by Cecelia's corporate representative is thus admissible against Bay Bridge under Rule 801(d)(2). *See also, e.g.*, *Klocke v. Watson*, No. 22-10348, 2023 WL 2823060, at *5 (5th Cir. 2023) (citing *Shafer*); *Phillips v. Grady Cnty. Bd. of Cnty. Comm'rs*, 92 F. App'x 692, 696 (10th Cir. 2004); *United States v. Est. of Mathewson*, No. CV SA-11-CA-00018-FB, 2016 WL 7409855, at *4 (W.D. Tex. Apr. 19, 2016); *N.W. v. City of Long Beach*, 2016 WL 9021966, at *5 (C.D. Cal. June 7, 2016). *But see Huff v. White Motor Corp.*, 609 F.2d 286, 291 (7th Cir. 1979) (reaching opposite conclusion).

Federal courts have applied Rule 801(d)(2) in other similar settings. The Eighth Circuit recently explained that a "successor" corporation "necessarily adopts" its predecessor's statements, which are admissible against the successor

under Rule 801(d)(2). *Azarax, Inc.* v. *Syverson*, 990 F.3d 648, 652 (8th Cir. 2021); *accord Lavoho, LLC v. Apple, Inc.*, 232 F. Supp. 3d 513, 529 n.19 (S.D.N.Y. 2016); *Rock Creek Hydropower, Inc.* v. *Enel N. Am., Inc.*, No. CV-04-0556-S-BLW, 2006 WL 292107, at *2 n.1 (D. Idaho Feb. 7, 2006); *Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp.2d 487, 504 (D. Del. 2005); *Sherif v. AstraZeneca*, No. CIV.A. 00-3285, 2002 WL 32350023, at *3 (E.D. Pa. May 9, 2002); *Rogers* v. *First Oakbrook Corp. Syndicate*, No. C 95-2593 FMS, 1996 WL 329635, at *5 (N.D. Cal. June 6, 1996); *cf. Wells Fargo Bank, N.A.* v. *Lincoln Ben. Life Co.*, 643 F. App'x 944, 946 (11th Cir. 2016) (per curiam).

Meanwhile, the Equal Employment Opportunity Commission may bring actions seeking relief for an aggrieved employee who was the victim of discrimination. In such enforcement actions, federal courts have allowed employers to introduce an employee's out-of-court statement against the Commission—which is a different party than, but derives its claim from, the employee. *See, e.g.*, *Equal Emp. Opportunity Comm'n v. Triangle Catering, LLC*, No. 5:15-CV-00016-FL, 2017 WL 818261, at *3 (E.D.N.C. Mar. 1, 2017); *Placer ARC*, 2016 WL 74032, at *2.

Admitting Siegel's testimony makes sense. Failing to apply Rule 801(d)(2) in this context and others like it would produce arbitrary results depending on who sues, *i.e.*, an individual versus his estate, a predecessor corporation or its successor,

an employee versus the Commission.  At worst, the Bankruptcy Court's approach encourages transfers to deprive courts of damning evidence.  That is what happened here:  After John Siegel died, Cecelia transferred its claim, and Bay Bridge sought to leverage the transfer to exclude the most probative evidence.  This Court should not reward that gambit.

**2**.  The Supreme Court recently approved an amendment removing any doubt that Rule 801(d)(2) applies here.  The amendment becomes effective December 1, 2024, and will apply to pending cases retroactively.  *See* Order Amending Federal Rules of Evidence, 8 (U.S., April 2, 2024) ("Order Amending Rules"), https://tinyurl.com/mjra3w89.  This Court should apply the amendment so long as this appeal remains pending on December 1.  At minimum, the amendment confirms this Court previously applied Rule 801(d)(2) correctly in *Shafer*.

The amendment explains that if "a party's claim" "is directly derived from a declarant or the declarant's principal, a statement that would be admissible against the declarant or the principal under this rule is also admissible against the party." *Id*. John Siegel was the declarant.  Bay Bridge's claim "is directly derived" from Cecelia, which is the declarant itself (through its corporate witness) or at minimum

the declarant's "principal." As a result, a statement admissible against Cecelia under Rule 801(d)(2) is conclusively admissible against Bay Bridge.

The Advisory Committee explained that federal courts were previously split when a "claim or defense has been transferred to another (either by agreement or by operation of law)." *Report of the Advisory Committee on Evidence Rules*, 6 (May 10, 2023), https://tinyurl.com/5duuhbam. Some follow *Shafer*'s approach and "permit the statements." *Id*. Others "foreclose admissibility because the statement was made by one who is technically not the party-opponent in the case." *Id*. The issue frequently arises with respect to a "decedent and estate"—as in *Shafer*—but can also occur "in a variety of predecessor/successor situations." *Id*.

Because the "successor-in-interest is standing in the shoes of the declarant," "the declarant is in substance the party-opponent." *Id*. A "contrary rule results in random application of Rule 801(d)(2), and possible strategic action, such as assigning a claim in order to avoid admissibility of a statement"—*i.e.*, the very gambit Bay Bridge attempted. *Id*.; *see Agenda Book for the Committee on Rules of Practice and Procedure*, 958 (June 6, 2023), https://tinyurl.com/bdzmw9ej (explaining logic of applying Rule 801(d)(2)).

Courts give amendments to the Federal Rules "retroactive application to the maximum extent possible," unless doing so "would work injustice." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 335 n.2 (5th Cir. 2004) (quoting *Burt v.*

*Ware*, 14 F.3d 256, 258 (5th Cir. 1994) (per curiam)); *accord Paluch v. Sec'y Pennsylvania Dep't Corr.*, 442 F. App'x 690, 693 (3d Cir. 2011) (per curiam).  This "is necessarily a case-by-case consideration," *United States v. Lozano*, 63 F. App'x 962, 963 (8th Cir. 2003) (per curiam), and this Court and sister Circuits have applied amendments to cases on appeal, *see, e.g.*, *id.*; *United States v. Anderson*, 783 F.3d 727, 741 (8th Cir. 2015); *United States. v. Sperrazza*, 804 F.3d 1113, 1121 (11th Cir. 2015); *United States v. Ratliff*, 58 F. App'x 77, 79 (6th Cir. 2003) (per curiam); *Moore v. Local 569 of Intern. Broth. of Elec. Workers*, 53 F.3d 1054, 1058 (9th Cir. 1995); *see also Lighting & Power Services, Inc. v. Roberts*, 354 F.3d 817, 820 (8th Cir. 2004).

The equities strongly favor applying the clarified Rule 801(d)(2) here. Siegel's testimony is critical, and it would be unjust to reward Bay Bridge's tactics based upon a "procedural loophole." *Burt*, 14 F.3d at 260 (quotation marks omitted). Additionally, if the Court remands the matter for another reason—for instance, because the Bankruptcy Court egregiously erred in its analysis of Federal Rule of Civil Procedure 32, *see infra* pp. 30-34—there would be no reason not to apply the amended version of Rule 801(d)(2) on remand.[2]

---

[2] In dictum, this Court has suggested that "a new rule of evidence would not require an appellate remand for a new trial." *Wright v. Morris*, 111 F.3d 414, 419 (6th Cir. 1997) (quoting *Landgraf v. USI Film Prod.*, 511 U.S. 244, 275 n.29 (1994)). Because *Wright* involved a statute that did not apply retroactively by its plain terms, that statement was immaterial to the outcome. *See also Covino v. Reopel*, 89 F.3d

**3**.  The decision Bay Bridge drafted for the Bankruptcy Court held that *Calhoun v. Baylor*, 646 F.2d 1158 (6th Cir. 1981), forecloses applying Rule 801(d)(2) here.  That is wrong.

In *Calhoun*, a bankruptcy trustee of a debtor company—suing to protect the company's creditors—alleged that a former employee of the bankrupt company had received fraudulently conveyed funds.  The employee argued that hearsay statements by employees who participated in the fraudulent scheme were admissible against the company—and therefore were admissible against the trustee suing to protect the company's creditors.  This Court disagreed: "In a suit alleging fraud by" "employees" against creditors, "those creditors should not be bound by the [employees'] statements."  *Id*. at 1162.

That holding makes sense: A bankruptcy trustee is nominally the company's successor.  In substance, however, trustees often seek recovery for creditors.  Binding creditors to out of court statements of their adversaries under Rule 801(d)(2) might lead to the adversary's fraudulent statements foreclosing creditors' efforts to combat the very fraud perpetuated against them.

In dictum, *Calhoun* stated that "Rule 801(d)(2) does not include statements by predecessors in interest among the types of statements the rule makes

---

105, 108 (2d Cir. 1996) (*Landgraf*'s footnote quoted in *Wright* is also dicta).  In any event, *Wright*'s language does not foreclose relief based on the equities of this case, especially if the Court reopens the matter by remanding.

admissible." *Id*. Bay Bridge overreads that dictum to mean that this Court conclusively held that Rule 801(d)(2) may not *ever* apply when an entity steps into another's shoes. But the Court's holding was narrower: It prevented creditors from being bound by the statements of an adverse party who perpetuated the fraud against them, and the court was concerned "particularly [with] bankruptcies." *Id*. at 1163. *Calhoun*'s narrowness is demonstrated by *Shafer*, an influential decision which three years later admitted a successor in interests' statements under Rule 801(d)(2); *see In re Bayonne Med. Ctr.*, No. 07-15195 MS, 2011 WL 5900960, at *11 n.41 (Bankr. D.N.J. Nov. 1, 2011) (explaining *Calhoun* applies only when "the trustee's action was that of a creditor," but not when the action was "derived directly from" the debtor); *see also Edwards v. U.S. Att'y Gen.*, 97 F.4th 725, 736 (11th Cir. 2024) ("[W]e have a duty to reconcile, where possible, prior precedents that appear to be in tension.").[3]

**B.    Siegel's Deposition Was Admissible Under Rule 32.**

**1**. The Bankruptcy Court also should have admitted Siegel's deposition under Federal Rule of Civil Procedure 32(a). "Rule 32(a) creates of its own force an

---

[3] If the Court applies the 2024 amendment, it would trump any preexisting construction of Rule 801(d)(2). For what it's worth, the amendment likely produces the same result as *Calhoun*. Under the amendment, a party's claim must be "directly derived from a declarant or the declarant's principal." Order Amending Rules, at 8. In *Calhoun*, the claims were *the creditors'*. They were not, *in substance*, derived from the debtor. *See Bayonne Med.*, 2011 WL 5900960, at *11 n.41.

exception to the hearsay rule." *Federal Practice & Procedure*, *supra* § 2143; *see Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 914 (9th Cir. 2008). The rule permits using a deposition if:

> (A) the party was present or represented at the taking of the deposition or had reasonable notice of it;
>
> (B) it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying; and
>
> (C) the use is allowed by Rule 32(a)(2) through (8).

Fed. R. Civ. P. 32(a)(1); *see* Fed. R. Bank. P. 7032.

Those conditions were met. (A) Bay Bridge's counsel was present. (B) No other Rule of Evidence would have barred Siegel's statements if offered at trial. For example, Insight did not introduce statements containing another declarant's hearsay. *See Federal Practice and Procedure*, *supra* § 2143. (C) Under Rule 32(a)(4), a deposition may be used when "the witness is dead." Fed. R. Civ. P. 32(a)(4)(A).

As Wright and Miller explain, if "the witness died during the taking of the deposition, so that a party did not have adequate opportunity to cross-examine, the court has discretion whether to admit the deposition." *Federal Practice and Procedure*, *supra* § 2146. A court weighs "the prejudice suffered by the objecting party if the deposition is admitted against that suffered by the party offering the deposition if it is excluded." *Duttle v. Bandler & Kass*, 127 F.R.D. 46, 49 (S.D.N.Y.

1989); *see Derewecki v. Pennsylvania R. Co.*, 353 F.2d 436, 442 (3d Cir. 1965) (similar); *Moore's Federal Practice*, *supra* § 32.22 (courts "weigh the prejudice").

The issue does not arise frequently, but there is a venerable tradition of courts admitting depositions when a critical witness died prior to cross examination. *See, e.g.*, *Duttle*, 127 F.R.D. at 49; *Waterman S. S. Corp. v. Gay Cottons*, 414 F.2d at 727; *Derewecki*, 353 F.2d at 442; *Paulson v. Jefferies & Co.*, No. CV 98-2644 FMC(AIJX), 2002 WL 34453504, at *5 (C.D. Cal. Mar. 20, 2002); *Re-Trac Corp. v. J. W. Speaker Corp.*, 212 F. Supp. at 169; *Inland Bonding Co. v. Mainland Nat. Bank of Pleasantville*, 3 F.R.D. 438, 439 (D.N.J. 1944); *see also* 1 *McCormick On Evidence* § 19 (8th ed., July 2022 Update) ("No matter how valuable cross-examination may be . . . the half-loaf of direct testimony is better than no bread at all."); *Bank of Montreal v. Est. of Antoine*, 86 So. 3d 1262, 1264 (Fla. App. 2012) (applying state rule, citing federal precedent); *Treharne v. Callahan*, 426 F.2d 58, 63 (3d Cir. 1970) ("[T]he testimony was generally held to be admissible."); *Forrest v. Kissam*, 7 Hill 463, 466-471 (N.Y. Sup. Ct. 1844) (discussing English precedent).

The equities overwhelmingly favor admission. The testimony was critical to Insight's case. *See infra* pp. 34-37. Meanwhile, Bay Bridge suffered no prejudice. Below, Bay Bridge tried to manufacture the appearance of prejudice, asserting it "would have" "cross-examined Mr. Siegel regarding his testimony" and the *AutoStyle* "factors." Declaration and Suggestion of Death, R. 78-1, Page 3. Those

assertions were conclusory.  Bay Bridge failed to articulate how "cross-examination would have helped it materially" and "with particularity."  *Waterman S. S. Corp.*, 414 F.2d at 728; *Re-Trac Corp.*, 212 F. Supp. at 169.  Indeed, when the parties scheduled Siegel's deposition and throughout two days of testimony, Bay Bridge *never* indicated it sought to ask questions, *never* indicated it needed any time for doing so, and identified *not one* document about which it sought to inquire.  Trial Tr., R. 117, Pages 10-11, 24, 26.

**2**.  The Bankruptcy Appellate Panel identified the legal error.  Courts do *not* "uniformly" hold "that Rule 32(a)(1) requires" cross examination.  BAP Opinion, BAP R. 24-2, Page 8.  But the Bankruptcy Appellate Panel attempted to salvage the opinion.  Because the Bankruptcy Court "had discretion to exclude" Siegel's deposition, the Panel would not "second-guess that exercise of discretion" "premised on the absence of cross-examination."  *Id*. at 9.

The problem is the Bankruptcy Court did *not* exercise discretion.  In the opinion Bay Bridge handcrafted, the court considered itself bound to exclude the evidence.  That was wrong.  At minimum, the Bankruptcy Court should reevaluate admission under the proper legal framework.  *See Tatman v. Collins*, 938 F.2d 509, 511 (4th Cir. 1991) (Niemeyer, J.).  Moreover, had the Bankruptcy Court exercised discretion to exclude Siegel's testimony, it would have abused that discretion, given

Insight's overwhelming need for the testimony and the lack of prejudice to Bay Bridge.

Nor can Bay Bridge justify exclusion under Rule 32 because the Bankruptcy Court—all in an opinion Bay Bridge drafted—separately stated in a different portion of the decision that, even "if it were admissible, Mr. Siegel's testimony would be entitled to little, if any, weight" due to the lack of cross-examination.  Opinion, R. 125, Page 13.  Again, Bay Bridge completely failed to explain "with particularity the area and scope of the matter not completely investigated" due to lack of cross examination.  *Re-Trac Corp.*, 212 F. Supp. at 169; *see Waterman S. S. Corp.*, 414 F.2d at 728.  The testimony deserves full weight.[4]

### C.    The Bankruptcy Court's Errors Were Highly Prejudicial.

The Court provides relief where exclusion "affects the substantial rights of the complaining party."  *Squire*, 820 F. App'x at 435.  Three facts demonstrate that the exclusion of Siegel's testimony greatly prejudiced Insight and requires reversal, or at minimum vacatur and remand.

*First*, the Bankruptcy Appellant Panel stressed that, with Siegel's testimony, the case would "have turned out differently."  BAP Opinion, BAP R. 24-2, Page 2; *see id*. at 7 (describing "evidentiary issue" as "crucial"); *id*. at 14 ("Here, without

---

[4] If the deposition is admissible under Rule 801(d)(2), the lack of cross examination is completely irrelevant.  *See* Notes of Advisory Committee on Proposed Rules, Fed. R. Evid. 801 ("No guarantee of trustworthiness is required.").

the benefit of Mr. Siegel's testimony . . . ."). Below, even Bay Bridge admitted Siegel's testimony was critical. When seeking to exclude the deposition, Bay Bridge described Siegel as "the person most capable of speaking to" the *AutoStyle* factors. Declaration and Suggestion of Death, R. 78-1, Page 3.

*Second*, as Bay Bridge itself stated, the content of Siegel's deposition went to the heart of the *AutoStyle* factors. Under *AutoStyle*, courts determine whether the movement of funds "reflect[ed] the characteristics of an arm's length negotiation." *AutoStyle*, 269 F.3d at 750 (quotation marks, ellipses, and brackets omitted). Among other factors, courts look for the existence of a maturity date, and schedules of principal and interest payments. *Id*. Courts also examine whether the debtor could obtain funding from other sources. *Id*.

In his deposition, Siegel confirmed the notes' terms were illusory. The terms came from a "generic template," and Siegel "didn't think about" them. Siegel Deposition, R. 70, Page 26. Siegel did not care about the maturity dates, which were "never all that important." *Id*. at 27. His family had "owned" Insight, no one "languished over any particular language," "it wasn't important" when the notes were paid, and the nominal interest rate had been "[j]ust pulled" "out of the air." *Id*. at 27-28; *id*. at 26 (no "thought was given" to "any" "specific provision," and Siegel only expected "Kirkland & Ellis" or another firm to read the note, presumably in a potential legal dispute); *id*. at 29 (neither "the actual name of the entity" "on the

promissory note" nor "the actual expiration date" were "important" to Siegel); *id*. at 63 ("[I]t was pretty boilerplate. . . . I didn't read it, you know.").

Siegel also detailed the extraordinary difficulty he faced obtaining financing, leading him to inject his own capital into Insight. *See id*. at 67. And Siegel explained that had been *no* arm's length transaction. He was an inside player "on both sides of" the transaction. *Id*. at 23; *see id*. at 27 ("We had . . . ultimate confidence in oursel[ves]."). When asked whether Insight engaged in due diligence before "entering into the promissory notes with Cecelia," Siegel scoffed "That's a ridiculous question." *Id*. at 64. Insight and Cecelia "were all indirectly related companies" with a "nepotistic relationship." *Id*. In short, Siegel's testimony showed this was the opposite of how parties treat a *bona fide* loan. This case was a classic instance where recharacterization was warranted.[5]

*Third*, Siegel's testimony went to the question of whether, irrespective of whether a court should recharacterize Cecelia's putative debt as equity, any debt even existed in the first place. *See* 11 U.S.C. § 502(b).

For example, Cecelia filed claims for $900,000 allegedly owed to Bowie Resource Partners, LLC by Terminal Logistics Solutions, LLC, which Bay Bridge

---

[5] The Bankruptcy Appellate Panel Acknowledged "Siegel's testimony" proves an extremely close "relationship[] between the purported creditor and the debtor" placing this case within the heartland of "other recharacterization decisions." BAP Opinion, BAP R. 24-2, Page 14.

claims were assumed by Insight and rolled into Cecelia's notes. *Compare* Disputed Notes, R. 70, Page 151 (Bowie's note), *with id*. at 27 (Cecelia's note listing Bowie's putative debts). But Siegel confirmed that Bowie *had been paid back*, as permitted under the terms of Bowie's note. As Siegel explained, it was thus "important to note the differences between" debts owed to Bowie and "these notes now where Cecelia" was owed money. *Id*. at 26 ("Bowie loaned the money; and then Bowie paid itself back.").[6]

## II. THE BANKRUPTCY COURT'S RECHARACTERIZATION ANALYSIS WAS RIDDLED WITH ERRORS.

When it excluded Siegel's critical testimony, the Bankruptcy Court blinded itself to reality. Even on the limited record the Bankruptcy Court considered, however, recharacterization was required. This Court should reverse. At minimum, the Court should correct the errors, vacate, and remand.

### A. Cecelia's Debt Is Eligible For Recharacterization.

As a threshold matter, nothing prevents applying *AutoStyle* to recharacterize Cecelia's claim. Bay Bridge's suggestions to the contrary lack merit.

---

[6] The Bankruptcy Appellate Panel recognized prejudice here too. BAP Opinion, BAP R. 24-2, Page 11. ("[T]o the extent ITS relied on Mr. Siegel's testimony to the effect that any notes payable to Bowie 'went away,' the Bankruptcy Court properly excluded that testimony, for the reasons set forth above.").

### 1. Non-Shareholder Debts Can Be Recharacterized.

In the Bay Bridge-drafted decision, the Bankruptcy Court held that Cecelia's claim was ineligible for recharacterization because Cecelia *itself* "was not" a preexisting "equity holder" in Insight. Opinion, R. 125, Page 27. Instead, the Siegel family owned and controlled both companies. The Bankruptcy Appellate Panel did not adopt the Bankruptcy Court's rank formalism. *See* BAP Opinion, BAP R. 24-2, Pages 13-14, 16. Nor should this Court.

Recharacterization is a flexible, substance-over-form approach that looks to "the particular circumstances of each case." *AutoStyle*, 269 F.3d at 750; *see In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 232 (4th Cir. 2006). Holding Cecelia's claim categorically ineligible for recharacterization would "put[] form over substance" and "invite equity investors to structure their capital contributions" to undermine "the purposes of recharacterization." *Dornier Aviation*, 453 F.3d at 234 (quotation marks omitted). That is why this Court and others have recharacterized non-shareholder debt as equity. *See, e.g.*, *Foresun, Inc. v. Comm'r*, 348 F.2d 1006, 1007 (6th Cir. 1965) (recharacterization of non-shareholder family member's debt as equity in tax context); *Carn v. Heesung PMTech Corp.*, 579 B.R. 282, 305 (M.D. Ala. 2017) (declining to dismiss trustee's request to recharacterize customer's payments as equity); *In re Comprehensive Power, Inc.*, 578 B.R. 14, 27 (Bankr. D. Mass. 2017) (" 'loan-to-own' transaction" could be recharacterized

where creditor lacked preexisting equity); *In re Hoffinger Indus., Inc.*, 327 B.R. 389, 400 (Bankr. E.D. Ark. 2005) (putative creditor owned by family members who also owned debtor); *In re AtlanticRancher, Inc.*, 279 B.R. 411, 435 (Bankr. D. Mass. 2002) ("[N]either Stanley nor Emilia Black were shareholders of the Debtor.").

### 2. *This Case Does Not Concern Veil Piercing.*

Bay Bridge's opinion suggested it would be necessary to pierce the corporate veil to recognize the fact that the Siegel family controlled both Cecelia and Insight. *See* Opinion, R. 125, Pages 31-35. That is incorrect. *See, e.g.*, *Hoffinger Indus.*, 327 B.R. at 415 (court emphasizing it did *not* "pierce the corporate veils"). The Bankruptcy Appellate Panel again declined to adopt this aspect of the decision below. This Court should too.

### 3. *Insider Status Was Not Required, And The Siegel Family Controlled Cecelia And Insight.*

Finally, the Bankruptcy Court suggested a creditor must formally qualify as an insider under the Bankruptcy Code for a court to recharacterize a transaction. Not so. Insiders may have particularly strong incentives to mislabel transactions, simultaneously seeking the benefits of equity and the protections of debt in bankruptcy. But non-insiders may have similar incentives, and recharacterization turns on "the particular circumstances of each case." *AutoStyle*, 269 F.3d at 750. Regardless, even if insider status were necessary, evidence other than the Siegel

deposition demonstrated the Siegel family's control over both companies, and Cecelia's status as an "insider."

*First*, Bay Bridge stipulated that John Siegel managed both companies, his wife owned Insight, and his wife and children owned Cecelia. *See* Undisputed Facts, R. 106, Page 2. That is a classic circumstance in which the putative creditor is an insider and, at minimum, where recharacterization is appropriate. *See, e.g.*, *Foresun*, 348 F.2d at 1007.

*Second*, Cecelia admitted its formal insider status in a discovery response. Bay Bridge introduced that discovery response at trial, repeatedly relied on Cecelia's other discovery responses, and can hardly object to that evidence. *See* Written Discovery, R. 68-29, Page 7; Draft Opinion, R. 124, Pages 14, 16, 17-18, 29, 43-44; Trial Tr., R. 117, Page 55 (Bay Bridge introducing "the entirety of those discovery responses"), 127 (response read into record without objection); Trial Tr., R. 118, Page 36 (Appellant arguing that Cecelia was an insider, without any correction by Bay Bridge).

*Third*, prior to submitting the proposed opinion, Bay Bridge *never* contested that Cecelia was an insider, and at times affirmatively agreed it was. *See, e.g.*, Bay Bridge Trial Br., R. 79, Page 21 (noting Cecelia's "status as an insider"); *id*. at 25 (noting "Cecelia's status as an insider"). Bay Bridge thus waived any argument to the contrary at trial.

The opinion Bay Bridge drafted acknowledged that, if Mrs. Siegel held more than 20% of Cecelia, the Bankruptcy Code required treating Cecelia as an insider. *See* Opinion, R. 125, Page 30. That is because the Bankruptcy Code defines "insider" to include affiliates and their insiders, and an affiliate is defined as any corporation which is 20% owned by someone with 20% ownership in a debtor. 11 U.S.C. §§ 101(2)(B), (31)(E). The opinion theorized, however, that the Bankruptcy Code's statutory definition of an insider could not apply because the parties "stipulated that Cecelia was owned by Mrs. Siegel and Mr. Siegel's adult children," but not "that Mrs. Siegel owned 20% or more of Cecelia's voting securities." Opinion, R. 125, Page 30.

This was an extraordinary bait and switch: Bay Bridge had *never* raised this formalistic argument before its proposed opinion. Appellant had no opportunity to rebut it. Regardless, the Bankruptcy Code defines "insider" to "*include*[]" certain statutorily defined categories. 11 U.S.C. § 101(31) (emphasis added). As Justice Sotomayor explained, that statutory language authorizes courts to consider others to be insiders as well. *See U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 403 (2018) (Sotomayor, J., concurring, joined by Kennedy, Thomas, and Gorsuch, J.J.). And it makes zero sense not to extend insider status to Cecelia because Mrs. Siegel, who owned all of Insight, *might* own less than 20% of Cecelia, when *the Siegel children* own the remainder. *Cf.* 11

41

U.S.C. §§ 101(31)(A)(i), (B)(vi), (C)(ii) (insider includes certain "relative[s]").

Indeed, holding that this ownership structure conclusively shelters the Siegels invites

gamesmanship. *See Foresun*, 348 F.2d at 1007 (recharacterizing mother's debt).

This Court may consider Cecelia an insider. Regardless, it may subject the family's

claim to recharacterization based on "the particular circumstances of [this] case."

*AutoStyle*, 269 F.3d at 750.

### B. The *AutoStyle* Factors Required Recharacterization.

The *AutoSyle* factors probe one central question: Does a putative debt

transaction "reflect the characteristics of an arm's length negotiation." *AutoStyle*,

269 F.3d at 750; *see Dornier Aviation*, 453 F.3d at 234. Here, the answer was "no."

In holding otherwise, the Bankruptcy Court made repeated and egregious errors.

#### 1. *The Absence Of A Fixed Maturity Date And Interest Payments Is Indicative Of Equity.*

*Bona fide* lenders need to be assured of repayment and profit. As result, "[t]he

absence of a fixed maturity date and a fixed obligation to repay" indicates "advances

were capital contributions and not loans." *AutoStyle*, 269 F.3d at 750.

This *AutoStyle* factor cut strongly in favor of recharacterization. The Cecelia

notes came due three years after execution. In practice, the three-year maturity date

was illusory. The Siegels repeatedly extended the maturity date by executing a new

note that rolled up the prior one. Disputed Notes, R. 70, Pages 152-167. Even

without John Siegel's damning testimony, this was a powerful sign the Siegels never

intended to treat these notes as *bona fide* debt.  *See In re Autobacs Strauss, Inc.*, 473 B.R. 525, 574 (Bankr. D. Del. 2012).

Below, Bay Bridge disclaimed any argument the notes possessed a fixed maturity date.  Instead, Bay Bridge emphasized that the notes were payable on demand.  Opinion, R. 125, Page 37; Trial Tr., R. 118, Page 14 ("[T]his is a demand note.  There is no maturity, it's just demand."); *id.* at 24 ("[T]hese were demand notes.").  In doing so, Bay Bridge made two errors.

*First*, Bay Bridge focused on the fact that demand notes are permissible under Kentucky law.  Opinion, R. 125, Page 37.  That is irrelevant.  The question is whether that instruments bore substantive characteristics of an arm's length transaction.  *AutoStyle*, 269 F.3d at 750.  They did not.

*Second*, the opinion latched onto *AutoStyle*'s observation that "the use of demand notes *along with a fixed rate of interest and interest payments* is more indicative of debt than equity."  *AutoStyle*, 269 F.3d at 750 (emphasis added).  But the opinion overlooked a critical fact:  Cecelia did *not* receive "regular interest payments."  *Id.*

The absence of interest payments was extremely important.  "A true lender is concerned with interest," and periodic interest payments are hallmarks of loans.  *Stinnett's Pontiac Serv., Inc. v. Comm'r*, 730 F.2d 634, 640 (11th Cir. 1984) (brackets and quotation marks omitted); *Texas Farm Bureau v. United States*, 725

F.2d 307, 314 (5th Cir. 1984) ("Failure to insist on interest payments clearly demonstrates that TFB was not concerned with interest income.").  The Autumn Wind loan, for example, required Insight to "pay interest monthly."  Bridge Loan, R. 74, Page 36.  Interest payments so strongly signal debt is *bona fide* that the existence of interest payments constitutes an additional *AutoStyle* factor.  *See AutoStyle*, 269 F.3d at 750.

Cecelia's demand notes nominally required annual interest payments. But *no payment needed to be made*.  Interest was instead "paid-in-kind" "by being capitalized and *added to the Principal Amount*."  Disputed Notes, R. 70, Page 164 (emphasis added); *see, e.g.*, *In re Live Primary, LLC*, 626 B.R. 171, 200 (Bankr. S.D.N.Y. 2021) ("[S]ection 9.2 provides for a nominal interest rate of 1% but does not require or allow for any interest payment."); Tandon Deposition, R. 68-28, Page 30 (payment-in-kind interest is rare).  Tellingly, this interest-on-paper was *never* added to the schedules listing principal owed on the notes.  *See* Tandon Deposition, R. 68-28, Page 29.  Thus, even without Siegel's testimony confirming the interest rate was illusory, the notes themselves established that fact.

Finally, if there was any doubt, *more* key terms were illusory.  The notes had to be repaid if Insight took on additional debt, absent a written waiver from Cecelia.  *See* Disputed Notes, R. 70, Page 165.  Yet when Insight received funds from Bay Bridge and Autumn Wind, Cecelia's existing notes went unpaid, and there is no

evidence Cecelia provided a waiver. The notes failed to define capitalized terms, confirming their slapdash nature. *See, e.g.*, *id.* (failing to define terms such as "Asset Sale," "Equity Issuance," "Extraordinary Receipts," "Non-Disturbance Agreement," and "Estoppel"). And the notes' schedules listed nearly $1 million owed to Cecelia when the debts ran to *other companies*. *See, e.g.*, Trial Tr., R. 117, Page 110 (wire paid by NextGen), Page 111 (cost of private plane attributable to Oasis); Disputed Notes, R. 70, Page 167 (listing Halas wires). None of this reflect how parties would structure a *bona fide* transaction.

### 2. Cecelia's Notes Were Unsecured.

Because lenders require security to assure repayment, the "absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans." *AutoStyle*, 269 F.3d at 752. Bay Bridge agrees "that there was no security for the Cecelia notes," Trial Tr., R. 118, Page 28, and the opinion Bay Bridge drafted acknowledged Cecelia's notes were unsecured. Opinion, R. 125, Page 45; *see* Claim, R. 73-5, Page 2. But the opinion then stated that "this factor should be given little weight since" Autumn Wind "was also willing to provide financing on an effectively unsecured basis." Opinion, R. 125, Page 45.

That was *utterly incorrect*. Autumn Wind's loan *was secured* by Insight's assets—expressly "*including, without limitation, rights under the Sub-Ground Lease*." Bridge Loan, R. 74, Pages 28, 38 (emphasis added); *see* Letter, Bk. R. 12,

Page 60.  Autumn Wind also possessed a security interest in Insight Terminal Holdings, including the holding company's ownership of Insight.  Bridge Loan, R. 74, Pages 26, 28, 30; Pledge, Bk. R. 12, Pages 64-65.  The Autumn Wind loan agreement was titled "Loan and *Security Agreement*."  Bridge Loan, R. 74, Page 26 (emphasis added, some capitalizations omitted).   If that were not enough (it was), Autumn Wind was treated as a secured creditor in the bankruptcy proceedings.  *See, e.g.*, Disclosure Statement, Bk. R. 245-3, Pages 8-9.  Neither Bay Bridge nor Cecelia brought an adversary proceeding to contest that fact, a reorganization plan was confirmed, and Autumn Wind's secured status was conclusively settled as a result. *See Browning v. Levy*, 283 F.3d 761, 771-774 (6th Cir. 2002).

In adopting Bay Bridge's proposed opinion wholesale, the Bankruptcy Court contorted Autumn Wind's loan agreement.  As Bay Bridge saw it, because the agreement defined the collateral as "all tangible and intangible *personal property* of the Loan Parties," the collateral did not include the sublease, which "constitutes an interest in *real property*."  Opinion, R. 125, Page 21 (emphasis added).

That is wrong.  The loan agreement defines collateral to include "all" "contract rights" "including, *without limitation, rights under the Sub-Ground Lease*."  Bridge Loan, R. 74, Page 28 (emphasis added).  That italicized text shows the parties intended the collateral to include the sublease.  The Bankruptcy Court's tortured reading makes no sense.  The "Sub-Ground Lease was [Insight's] only asset

46

of substantial value." Opinion, R. 125 at 20. The Bankruptcy Court, however, understood Autumn Wind to have no practical security interest, turning the provisions pertaining to the security interest into meaningless surplusage. *See In re Est. of Margolin*, 259 A.D.2d 396, 397 (N.Y. App. Div. 1999).[7] Meanwhile, the opinion *completely* ignored Autumn Wind's security interest in Insight Terminal Holdings, which independently provided Autumn Wind meaningful security.

Finally, the opinion stated that Autumn Wind had not filed a mortgage on the sublease, or offered proof of consent from parties in Oakland, seeming to suggest that Autumn Wind did not act like it had any security interest. Opinion, R. 125, Page 21. This is spurious. Autumn Wind filed UCC statements perfecting its security interest, and at minimum demonstrated the parties' intention that the loan be secured. *See* UCC Statement Bk. R. 67-5, Pages 1-2. Whether Autumn Wind potentially should have also filed a mortgage is irrelevant, especially because Autumn Wind possessed an independent security interest in Insight's equity. The question is whether Autumn Wind required a meaningful security interest. It did.

Even as it acknowledged that "the absence of security" in this case "favored recharacterization," the Bankruptcy Appellate Panel brushed past this glaring error. BAP Opinion, BAP R. 24-2, Page 16. This Court should not sweep this significant mistake under the rug.

---

[7] New York law governs the agreement. Bridge Loan, R. 74, Page 63.

### 3. *The Siegel Family Subordinated Itself To Outside Creditors.*

Equity holders typically do not receive payment ahead of creditors. Thus, when a company subordinates repayment "to claims of all other creditors," that subordination "indicates that the advances were capital contributions and not loans." *AutoStyle*, 269 F.3d at 752. Yet again, the factor strongly suggested that Cecelia's putative debt was really equity. Insight "never made any payments of any kind on the [Cecelia] notes, but paid all outside creditors instead." Tandon Deposition, R. 68-28, Page 30; *see* Written Discovery, R. 68-29, Page 8.

The opinion Bay Bridge drafted concluded that this "factor weighs against recharacterization" because the *text* of Cecelia's notes did not *formally* subordinate Cecelia to other outside creditors. Opinion, R. 125, Page 46. This was pure legal error. The terms of a note are sufficient, but not necessary, to show subordination. The parties' *actual behavior* also establishes subordination on a *de facto* basis. *See, e.g.*, *Dornier Aviation*, 453 F.3d at 236 (upholding finding of "*de facto* subordination agreement"); *Pontiac Serv.*, 730 F.2d at 639 ("Cargo repaid its obligations to its other creditors, but failed to pay Pontiac for Pontiac's advances. Pontiac was subordinated to Cargo's general creditors, and this subordination indicates that Pontiac's advances to Cargo were contributions to capital."); *Texas Farm Bureau*, 725 F.2d at 313-314 ("[T]he advances were de facto subordinated."); *In re Autobacs Strauss, Inc.*, 473 B.R. at 580 ("de facto subordination" favored recharacterization)

(quotation marks omitted). The Bankruptcy Appellate Panel declined to engage with this blatant error. This Court should correct it.

### 4. The Siegel Family Could Not Obtain Other Outside Funding.

*AutoStyle* teaches that it is "strong evidence" an insider's "advances were capital contributions rather than loans" if "reasonable" outside lenders would not "have acted in the same manner" as the insider. 269 F.3d at 752. Courts must therefore ask "whether a reasonable outside creditor would have made a loan to the debtor *on similar terms*." *Autobacs Strauss*, 473 B.R. at 579 (emphasis added) (quotation marks omitted).

Once more, this factor favored recharacterization. Eighteen prospective lenders "declined to lend" to Insight—a powerful sign that Cecelia's generous terms were dissimilar to what would have emerged from of "an arm's length negotiation." *AutoStyle*, 269 F.3d at 750; *Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 631 (6th Cir. 1986); *see* Written Discovery, R. 68-29, Pages 10, 16-17; Tandon Deposition, R. 68-22, Page 27.

What funding Insight obtained came on strict terms. Autumn Wind advanced a short-term loan "only on the condition of ample security as well as numerous other conditions that would enable it to recover"—a far cry from Cecelia's unsecured loan, with its illusory maturity date and non-existent interest payments. *Roth Steel*, 800

F.2d at 631.[8]  Meanwhile, Bay Bridge had provided a loan at a high 10% interest rate.  Bay Bridge Loan, R. 68-12, Pages 1-2.  Bay Bridge's note additionally permitted Bay Bridge the option of converting the loan into equity—which gave Bay Bridge the possibility of considerable additional upside.  *Id*. at 2.

Once more, the opinion Bay Bridge drafted contorted the record.  The opinion ignored the many lenders who turned down Insight.  The opinion instead concluded that the Autumn Wind loan and Bay Bridge's earlier loan showed Insight's "overwhelming" ability to "obtain financing from outside lending institutions." Opinion, R. 125, Page 45.  This ignored the critical differences between Autumn Wind's and Bay Bridge's loans, and Cecelia's unsecured "loan."  Indeed, here too, the Bankruptcy Court incorrectly characterized Autumn Wind's loan as "effectively unsecured."  *Id*.[9]

### 5. *The Siegel Family Expected To Be Repaid When Its Business Succeeded.*

"If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution."

---

[8] In addition to charging interest and requiring security, Autumn Wind *also* required Insight to provide a note worth an additional $3.35 million. *See* Bridge Loan, R. 74, Page 35.

[9] The opinion pointed to the fact that Bay Bridge provided post-petition financing on an unsecured basis.  Opinion, R. 125, Page 45.  Bay Bridge's post-petition loan was unlike Cecelia's loan.  It carried a 10% rate, had to be approved by the Bankruptcy Court, was afforded special priority as an administrative expense claim, and therefore needed to be repaid to confirm the reorganization plan.  Order

*AutoStyle*, 269 F.3d at 751.  This factor favored recharacterization.  The Siegel family expected repayment only after executing the sublease and securing funding to develop the Oakland terminal.  Written Discovery, R. 68-29, Page 7.

The Bankruptcy Court, however, concluded that "the source of repayment was not the success of the business[]," but was instead "the monetization of the Sub-Ground Lease by raising additional financing."  Opinion, R. 125, Page 41.  That cut the bologna too thin.  Insight could obtain additional funding only if the Oakland project moved forward.  The business's success, and the ability to acquire additional capital, were two sides of the same coin.

In the alternative, the Bankruptcy Court held that this factor deserved "little weight," cautioning that " 'excessive suspicion about loans made by owners and insiders of struggling enterprises would discourage legitimate efforts to keep a flagging business afloat.' "  *Id*. at 43 (quoting *In re Hedged-Invs. Assocs., Inc.*, 380 F.3d 1292, 1299 n.1 (10th Cir. 2004)).

But the Bankruptcy Court ignored what *Hedged Investors* said:  The way to avoid unduly penalizing owners who provided *bona fide* loans is to look to a "comprehensive set of criteria" when assessing recharacterization—not to

---

Permitting Financing, Bk. R. 167, Pages 4, 6; Confirmation Order, Bk. R. 379, Page 12; Bay Bridge's Objection, Bk. R. 314, Page 6.

artificially discount this factor, or any other. *Hedged-Invs.*, 380 F.3d at 1299 n.1; *see Autobacs Strauss*, 473 B.R. at 577. *AutoStyle* does just that.

Reversing the Bankruptcy Court will not discourage owners to lend funds to struggling companies. Owners who want the benefits of a creditor in bankruptcy need only treat their funding like debt before bankruptcy. What owners cannot do is treat capital advances like equity before bankruptcy, and later demand the protections of a creditor in bankruptcy.

### 6. The Siegel Family Financing Paid For The Sublease, Which Was A Capital Asset.

The use of funds "to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of *bona fide* indebtedness." *AutoStyle*, 269 F.3d at 752. A capital asset is a "long-term asset used in the operation of a business or used to produce goods or services, such as equipment, land, or an industrial plant." *Asset*, Black's Law Dictionary (11th ed. 2019).

Here, too, *AutoStyle* favored recharacterization. Insight had one capital asset: The option to execute the sublease. Of roughly $5.7 million the Siegel family poured into Insight, $2.6 million paid for that option. (The rest purportedly went to expenses like a private jet operated by Halas.) This $2.6 million was a substantial investment in a long-term asset intended to be used in Insight's future operations.

The Bankruptcy Court opinion acknowledged that Cecelia's funds paid for the option on the terminal. *See* Opinion, R. 125, Page 46. But it then stated that these

funds were not "used to purchase a capital asset." *Id.* This conclusory assertion does not wash. The sublease was not a routine expense. John Siegel was investing in a capital asset, hoping that it would pay dividends in the future.

### 7. Insight Was Inadequately Capitalized.

The debtor's thin or inadequate capitalization "at the time the transfer was made" provides "strong evidence that the advances are capital contributions rather than loans." *AutoStyle*, 269 F.3d at 751.

Here too, the facts favored recharacterization. Insight was "in serious financial straits at the time" the Siegel family injected funds into Cecelia. *Id.* Eighteen lenders turned it down, and the funding it could obtain came on strict terms. *See supra* p. 11. Indeed, Cecelia amended its note to add additional debt just *two days* before Insight filed for bankruptcy in 2019. *See* Disputed Notes, R. 70, Page 160. The petition noted that, at that time, Insight had between $1-10 million in assets, but $10-$50 million in debt. Petition, Bk. R. 1, Page 3.

In concluding otherwise, the Bankruptcy Court's opinion mischaracterized testimony. According to Bay Bridge, a witness "admitted" Autumn Wind viewed Insight "as adequately capitalized" because the Siegels and Bay Bridge had funded Insight. Opinion, R. 125, Page 40. Not so. The witness explained that such funding would count toward capitalization *only if* there was "a firm commitment" "to continue funding the business." Tandon Deposition, R. 68-28, Page 25. But the

Siegels and Bay Bridge had *not* provided a firm commitment. *Id.* Instead, Autumn Wind made a "game theory calculation" that they might continue to fund Insight rather than let their previous investments go under. *Id.*

Nor does it make sense to count the Siegel family's funds when assessing Insight's capitalization. Recharacterization asks whether a business was capitalized *absent* the challenged funds. *See AutoStyle*, 269 F.3d at 751. If courts included the *challenged* funds in assessing capitalization, every business would appear capitalized and this factor would be a nullity.

### 8. There Was An Identity Of Interest Between Insight And Cecelia.

*AutoStyle* directs a court to examine "the identity of interest between the creditor and the stockholder." 269 F.3d at 750. Among other things, if an existing equity owner "make[s] advances in proportion to their respective stock ownership, an equity contribution is indicated." *Id.* at 751. Here, the Siegel family owned and controlled Insight. This factor thus cut in favor of recharacterization, for that reason alone. In addition, because they owned the company, the Siegels advanced funds in proportion to their total ownership. *See Autobacs Strauss*, 473 B.R. at 578.

The Bankruptcy Court concluded, however, that because Bay Bridge *could* exercise an option to convert its debt into equity, and because Autumn Wind had the option of purchasing 15% of Insight Terminal Holdings, the Siegel family *really* controlled only 35% of Insight.

But even under that theory, there was *still* a close correlation between the amounts and the respective percentages of ownership. Bay Bridge had provided Insight $5 million, Autumn Wind provided $6.8 million, and the Siegels provided $5.7 million. Under the Bankruptcy Court's logic, the Siegel family owned 35% of Insight and contributed roughly 33% of Insight's pre-petition funding. This factor thus cut in favor of recharacterization.

### 9. There Was No Sinking Fund.

A sinking fund consists "of regular deposits that are accumulated with interest to pay off a long-term corporate or public debt." *Fund*, Black's Law Dictionary *supra*. Under *AutoStyle*, "[t]he failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans." 269 F.3d at 753. Where loans are "secur[ed] with liens," the security obviates any "need for a sinking fund." *Id.* (quotation marks omitted).

Sinking funds are more commonly associated "with publicly traded bonds." Opinion, R. 125, Page 46. But the absence of *both* a sinking fund *and* security suggests that Cecelia's debt was equity. *See AutoStyle*, 269 F.3d at 753; *Live Primary*, 626 B.R. at 206. At most, this factor does not apply in this context, and neither cuts in favor nor against recharacterization.

### 10. The Label Is Not Dispositive.

Finally, under *AutoStyle*, courts look to the labels of the putative debt instruments. The Bay Bridge-drafted opinion held the labels on the putative notes weighed "*heavily* against recharacterization." Opinion, R. 125, Page 36 (emphasis added). Not so. At most, the form of Cecelia's notes cut *weakly* against recharacterization.

The *absence* of an "instrument[] of indebtedness is a strong indication that the advances were capital contributions and not loans." *Autostyle*, 269 F.3d at 750 (emphasis added). But the converse is not necessarily true. After all, the point of recharacterization "is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else." *In re SubMicron Sys. Corp.,* 432 F.3d 448, 456 (3d Cir. 2006); *see Texas Farm Bureau*, 725 F.2d at 312.

\* \* \*

In sum, even without John Siegel's damning testimony, Cecelia's notes did not mirror the product of an arm's length transaction. Because the Siegels could not obtain other funding, the family advanced funds in exchange for an illusory maturity date, no regular interest payments, and no security. The family subordinated its putative debt to all other outside creditors, used the funds to pay for a capital asset,

and expected to be repaid based on their business's success.   This transaction bore the hallmarks of equity.

### III.   THE BANKRUPTCY COURT FAILED TO EXERCISE INDEPENDENT JUDGMENT IN ADOPTING BAY BRIDGE'S PROPOSED OPINION VERBATIM.

The Bankruptcy Court abused its discretion in adopting Bay Bridge's 48 pages of proposed findings of facts and conclusions of law word-for-word.   That error independently requires vacatur.

This Court disapproves of "a court's verbatim adoption of" opinions "submitted by counsel." *Mactec, Inc. v. Bechtel Jacobs Co., LLC*, 346 F. App'x 59, 70 (6th Cir. 2009); *see Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985); *Kilburn*, 938 F.2d at 671.  Reversal is required where there is no "evidence" the trial "court exercised independent judgment in adopting a party's proposed findings." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 300 (3d Cir. 2005) (quotation marks omitted) (finding court abused discretion).

A court demonstrates independent judgment when it modifies a proposed decision.  For example, in *Kilburn*, the district court rejected findings, "renumbered the paragraphs," "wrote its own introductory paragraph," "substantially expanded upon" the winning side's "conclusion," and "added language denying" a motion for directed verdict as moot.  *Kilburn*, 938 F.2d at 671-672.  In *Andre v. Bendix Corp.*, 774 F.2d 786 (7th Cir. 1985)—a decision on which *Kilburn* relied—the trial court made alterations in "94 places," "from corrections of typographical errors to addition

or deletion of whole paragraphs." *Id*. at 800. The "large number of editorial alterations" indicated that "the district court read the post-trial brief before adopting it." *Id*.

Here, by contrast, the Bankruptcy Court deleted the word "proposed" and added a boilerplate order. Because the Bankruptcy Court used widow-and-orphan control in word processing software, the pagination is slightly different. Otherwise, the opinion is identical to Bay Bridge's draft. *Compare* Proposed Opinion, R. 124, *with* Opinion, R. 125. There is thus no indication that the Bankruptcy Court exercised *any* independent judgment.

That is particularly concerning because Bay Bridge's proposed opinion contained glaring errors. Rule 32 did *not* prevent the introduction of Siegel's critical testimony, *see supra* pp. 30-34; Autumn Wind's loan was *not* effectively unsecured, *see supra* pp. 45-47; and Cecelia's debts *were* subordinated, *see supra* pp. 48-49. These obvious errors, and others besides, betray the degree to which the Bankruptcy Court abrogated its duty. *Cf.* Trial Tr., R. 117, Page 30 ("I defy you to find a bankruptcy judge anywhere who has written more."). When considering how to remedy this troubling abuse of discretion, this Court may wish to consider reassigning the case on remand.

## CONCLUSION

For the foregoing reasons, this Court should reverse. In the alternative, the Court should vacate and remand.

Respectfully submitted,

/s/ Jessica L. Ellsworth

ROBERT HIRSH
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 318-3060
robert.hirsh@nortonrosefulbright.com

JESSICA L. ELLSWORTH
NATHANIEL A.G. ZELINSKY
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

DAVID P. SIMONDS
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
(310) 785-4600
david.simonds@hoganlovells.com

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,995 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b).

This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in Times New Roman 14-point font.

July 29, 2024                                  /s/ Jessica L. Ellsworth
                                                   Jessica L. Ellsworth

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system on July 29, 2024. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

July 29, 2024

/s/ Jessica L. Ellsworth

Jessica L. Ellsworth

# DESIGNATION OF RELEVANT LOWER COURT DOCUMENTS

## 1. Record Excerpts from 3:21-ap-03013 (R.)

| R. | Document Description | Pages |
|---|---|---|
| 1 | Complaint | 1-22 |
| 9-1 | Line of Credit Note | 1-4 |
| 21 | Intervention Order | 1-5 |
| 62 | Summary Judgment Order | 1-3 |
| 68-28 | Tandon Deposition | 1-35 |
| 68-29 | Written Discovery | 1-17 |
| 70 | Siegel Deposition | 1-133 |
| 70 | Disputed Notes | 148-168 |
| 73-5 | Claim | 1-3 |
| 74 | Bridge Loan | 25-70 |
| 78-1 | Declaration and Suggestion of Death | 1-4, 375 |
| 79 | Bay Bridge Trial Br. | 1-34 |
| 106 | Undisputed Facts | 1-7 |
| 117 | Trial Tr., 09/13/2022 | 1-142 |
| 118 | Trial Tr., 09/14/2022 | 1-72 |
| 124 | Proposed Opinion | 1-48 |
| 125 | Opinion | 1-49 |
| 126 | Notice of Appeal | 1-4 |

## 2. Record Excerpts from 3:19-bk-32231 (Bk. R.)

| Bk. R. | Document Description | Pages |
|---|---|---|
| 1 | Petition | 1-7 |
| 12 | Letter (Exhibit B to Tandon Declaration) | 59-61 |
| 12 | Pledge (Exhibit C to Tandon Declaration) | 64-78 |
| 67-5 | UCC Statement | 1-2 |
| 167 | Order Permitting Financing | 1-11 |
| 195 | Plan | 1-39 |
| 245-3 | Disclosure Statement | 1-39 |
| 314 | Bay Bridge's Objection | 1-10 |
| 379 | Confirmation Order | 1-22 |
| 442 | Notice of Transfer | 1-2 |

**3.   Record Excerpts from BAP (Case #23-8004) (BAP R.)**

| BAP R. | Document Description | Pages |
|:------:|---------------------|:-----:|
| 24-2 | BAP Opinion | 1-17 |
| 25-1 | Judgment | 1-2 |
| 26 | Notice of Appeal | 1-26 |